UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF MASSACHUSETTS

| | |
|---|---|
| UNITED STATES | ) <br> ) <br> ) |
| v. | )    Crim. No. 2017-CR-10141-DPW <br> ) |
| DOMINGO GONZALEZ-MARTINEZ, | ) <br> ) |
|     Defendant. | ) <br> ) |

**SENTENCING MEMORANDUM**

**I.    INTRODUCTION**

Domingo Gonzalez-Martinez lost his way. He came to America as a teenager. One of eight children born in the Domincan Republic to a largely poor family, he came hoping for a better life. For almost 30 years, he had it—not economically, for he continued to live a life a modest means—but he was rich with family and friends. Unfortunately, in an effort to better his circumstances, he exercised horrible judgment. Money was tight; he was attempting to transition to finally owning a bodega, rather than simply working at one; he lost patience. Never having used drugs himself, he had no meaningful or tangible idea how harmful they were. Thus, he figured he was causing no harm by middling (essentially setting up a seller and a buyer while taking a small profit for himself). It was not a lot of money by any stretch, but it was something.

He understands now that, in addition to breaking the law, he was contributing to a huge social problem. At the time of his arrest, he did not. Nor did he fully realize just

1

how severe the consequences would be for his actions. As if being incarcerated for the first time were not enough, he now sits likely to be deported to a country he has not known for 30 years. His home is America. His long-time girlfriend (who he considers to be his wife) is here, her son (who he considers to be his son) is here, most of his siblings are here. He threw all that away for a short-term gain.

Given the circumstances, his role in the conspiracy, and other issues discussed below, a sentence of 36 months is sufficient to accomplish the goals of sentencing.

## II. APPLICATION OF 18 U.S.C. § 3553

Consistent with the federal courts' long-standing, deep concern for individualized sentencing, the United States Supreme Court has repeatedly affirmed individualized assessments accomplished by considering applicable 18 U.S.C. § 3553(a) factors in fashioning an appropriate sentence. *See e.g. United States v. Booker*, 543 U.S. 220, 259-260 (2005); *Rita v. United States,* 551 U.S. 338 (2007); *Gall v. United States*, 552 U.S. 38 (2007); *Pepper v. United States*, 562 U.S. 476 (2011).[1] Moreover, the U.S. Supreme Court has highlighted Congress's directive that: "[n]o limitation . . . be placed on the information concerning the background, character, and conduct of a defendant that a district court may receive and consider for the purpose of imposing an appropriate sentence." *Pepper*, *supra*, at 490-91, *citing* 18 U.S.C. § 3661.

With respect to application of the Guidelines, the district court <u>cannot</u> presume

---

[1] The sentencing court is not required to consider individually each of the Section 3553(a) factors before issuing a sentence. Rather, a district court need only consider the factors *en masse* and state its reasons for imposing a given sentence.

that the Guidelines range applies to any particular case. *Rita v. United States*, 551 U.S. 338 (2007). Rather, the Guidelines are simply a starting point from which the district court then has the discretion to "conduct an inquiry broad in scope, largely unlimited either as to the kind of information [they] may consider, or the source from which it may come. *Pepper*, *supra* at 489-90.

Sentencing under Section 3553(a) therefore requires the Court to start with the minimum sentence permissible and add only so much additional punishment, if any, as is necessary to comply with Section 3553(a)'s purposes. *See Kimbrough v. United States*, 552 U.S. 85, 101 (2007) (Section 3553(a) "as modified by *Booker*, contains an overarching provision instructing district courts to 'impose a sentence sufficient, but not greater than necessary' to accomplish the goals of sentencing . . . .")

There are several factors here that, when taken together, warrant a below guideline sentence. As highlighted below, Gonzalez-Martinez has many mitigating factors: he will be deported because of this offense, he will be separated from his family and friends, not just during the sentence but upon release (because of deportation), he has no criminal history, he has ongoing medical issues, and his sentence should be less than others in the same conspiracy who were more culpable than him.

## III. RELEVANT SENTENCING FACTORS

### A. HISTORY & CHARACTERISTICS

The PSR accurately describes Gonzalez-Martinez's background. He came to the U.S. as a teenager; his father, who he had never met, helped bring him over. He was never formally educated. All he knew how to do was work. He worked many jobs in his

lifetime. The most common was working in bodegas. He came to really know the bodega business and, prior to his arrest, had hopes of owning his own.

Gonzalez-Martinez has always been a good friend and family man. He has submitted 26 letters of support, a staggering amount. *See* Exhibit 1. His closest relatives—his long-time girlfriend and siblings—are among those most hurt by his actions; they are also the most supportive. Following his arrest, their devotion to him never wavered. Whether he was guilty or not, they have remained by his side. Put differently, despite his guilt and admission to his involvement in this scheme, they have vowed to help him get through this. He has always been there for them; now it is their turn to be supportive of him. Just a brief sampling of the letters of support show how much of an impact he has had:

> *Throughout the years I have learned to admire him because he helps his family all the time and he is respectful with my family as well. Each and everyday I have fallen in love with this man because of his romantic actions, and his sensibility towards others. Throughout the years, Domingo has made me realize that he is a generous yet caring man. Not a day goes by when he let's me know how much he loves me and my son. He is always trying to make us laugh and feel better.*
>
> -Mildred Betances (Girlfriend)
>
> *I grew up with Domingo, so I can tell you who he is as a person, a father, a husband, and a true friend. Domingo has help me with my kids, and that to me means the world. There were situations where I had no money at all, no food, and no support, and he was always there to lend a hand. My brother motivated me to open my own business and go back to school, and because of that today, I can say that, my kids and I have improved our lives.*
>
> -Roma Gonzalez (Sister)
>
> *My father is known to have a big heart. He's a generous person who will offer help to someone who needs it. Gorwing up, he was always there for me. When my mother and I didn't have food to eat he would always provide and never failed to.*

4

-Naisha Diaz (Daughter)

*Domingo Gonzalez gave me the opportunity to experience what working hard means by accepting me as his helper in my younger years of life. I was a witness of his excellent working morals and his extraordinary capacity to help people when needed.*

-Juan Difo (Friend)

*When I went to Massachusetts in August of 2016, he was the most hospitable and welcoming uncle. He took me shopping and I ate my favorite meal at his house.*

-Taisha Gomez (Niece)

*I remember not having a job and him offering me a part-time at his grocery store. He also provided us with groceries when we didn't have enough at home. It meant so much to us because sometimes we didn't have money or food and he never thought about charging us with anything.*

*…he helps everyone he can, and he always makes people laugh. I don't remember a time where he hasn't made a joke or has done something funny to make someone feel better.*

*…Another reason why I admire him so much, is because he raised his stepson Alwyn. Even though the child was not his, he had the compassion in him to care for him and provide him with everything he needed.*

-Critabel Corniel (Nephew)

Gonzalez-Martinez managed to remain so positive and so generous despite never working more than minimum-wage type jobs. His income was never more than about $20K a year. After working for others for so long, he finally had the chance to own his own bodega. Though it is not clear whether that would have changed his financial circumstances dramatically, it offered him a sense of pride in ownership.[2] Unfortunately, he had already entered into this conspiracy.

---

[2] This opportunity did not come because of his involvement in this scheme. It was an independent opportunity. The money he raised to buy the bodega came from two documented, personal loans (from his brother and an acquaintance).

5

B.     **NATURE & CIRCUMSTANCES OF THE OFFENSE**

Gonzalez-Martinez was a middleman, literally. "Middling" is a common thing in drug distribution schemes where some people are making a small profit by connecting a distributor and a buyer. Gonzalez-Martinez did not run an empire, like Patrone; nor did he sell to users. Rather, he connected a source with a buyer, in this case, Patrone.

Gonzalez-Martinez's involvement began and ended with "middling." He is not responsible for any violence, firearms, money laundering, or any other collateral criminal activities often associated with drug conspiracies. His position as a middleman also shielded him from seeing the true consequences of his conduct. That is, not having experienced drug addiction or use himself, the effects of that were lost on him; they were theoretical and distant. It allowed him to commit what he believed at the time to be a low stakes crime. However, after reading the discovery in his case, and taking responsibility for his role, Domingo-Gonzalez understands the enormity of his conduct.

Gonzalez-Martinez continues to object to the amount of drugs attributable to him. Probation, and the Government, believe he is responsible for between 1.2 and 4 KG of fentanyl; Gonzalez-Martinez maintains he is responsible for between 400G and 1.2KG. In addition to his objections noted in the PSR, he adds the following. Probation and the Government overestimate how much the Patrone DTO was capable of distributing. It basis these estimates and interpretations of phone calls—often boasts between conspirators—about numbers available for sale and distribution.

The main response to Gonzalez-Martinez's assertion that he was not likely selling a kilogram for approximately $60,000 is that such a sale would have still allowed

6

Patrone to profit by cutting it into 7-10 times the amount. That is, by adding additive, they speculate someone like Patrone could turn one kilogram into 7-10 kilograms. At that point, he could resell at derive a huge profit.

The math continues to be flawed. The Government's own estimate of Patrone's sales—even believing every brag Patrone made was true—is that he sold about $900,000 worth of drugs over the 180-day wiretap. Further dividing that, it estimates he sold about $540,000 of fentanyl (equaling about 13 kilograms). This is wrong for a few reasons. If Patrone could really turn one kilogram into 7 or 8 o 10, then one kilogram cut by those amounts would yield $280,000 - $400,000 (at $40 a gram in resale). Patrone would only need to have bought 2 kilograms, at most, to get to $540,000 in sales. Given the totality of the different number of times Patrone had to buy from his sources, it is unlikely he was buying 1 kilogram at a time. If so, then there would have only been two purchases.

Instead, it is clear Patrone made several purchases, often, from different sources in order to maintain his business. There were even times when he bought what he believed to be good drugs that turned out to be bad (*i.e.* fake); indeed, he returned bad (*i.e.* fake) drugs to Gonzalez-Martinez and different laboratory reports turned up negative tests in some of the seizures. Thus, it is more likely that Patrone made various, smaller purchases over the course of the conspiracy from various sources.

Gonzalez-Martinez does not dispute being a source for Patrone. He merely disputes the amounts attributable to him. They are inconsistent with his lifestyle and the way in which Patrone bought and re-sold product. Gonzalez-Martinez's base

guideline level should be 30, adjusted to 27 for acceptance of responsibility, and a guideline range of 70-87 months.

### C. NEED TO AVOID UNWARRANTED SENTENCE DISPARITIES

This Court has already imposed several below guideline sentences for various co-conspirators; and it has done so for persons with higher guideline ranges. Oscar Marcano-Valverde received a sentence of 60 months despite an offense level of 31 (which included an enhancement for a gun) and a guideline range of 108-135 months. Victor Gonzalez-Gonzalez received a sentence of 54 months despite an offense level of 29 and a guideline range of 87-108 months. Both of them, like Gonzalez-Martinez, also had immigration concerns that would result in likely deportation.[3] Lugo received a sentence of 60 months despite an offense level of at least 29 and a guideline range of 87-108 months.

Gonzalez-Martinez's offense level is less than all of them. It is 27 with a guideline range of 70-87 months. A guideline sentence would result in a sentence greater than these co-defendants despite his lesser involvement. Accordingly, to be consistent, this Court should also give Gonzalez-Martinez a below guideline sentence. All things being equal, and consistent with these other sentences, this Court should impose a sentence of about half as long as the middle of the guideline range (*i.e.* about half of 78.5 months or

---

[3] Gonzalez-Martinez was lawfully in this country; counsel believes neither Marcano-Valverde nor Gonzalez-Gonzalez were. Thus, while all will suffer a similar fate—deportation—Gonzalez-Martinez is the only one to have lived and worked, lawfully, during his time in the U.S. He thus did not violate the law when coming here and also stands to lose more since he actually had status.

8

roughly 39 months).

Gonzalez-Martinez is asking for a sentence of 36 months, however, for the additional reasons stated below.

### D. NEED FOR THE SENTENCE IMPOSED

One federal judge has framed the purposes of sentencing as follows:

> We have long understood that sentencing serves the purposes of retribution, deterrence, incapacitation, and rehabilitation. Deterrence, incapacitation, and rehabilitation are prospective and societal – each looks forward and asks: What amount and kind of punishment will help make society safe? In contrast, retribution imposes punishment based upon moral culpability and asks: What penalty is needed to restore the offender to moral standing within the community?

*United States v. Cole*, 622 F. Supp. 2d 632, 637 (N.D. Ohio 2008).[4] Retribution, incapacitation and deterrence, will inarguably be achieved by confinement, given Gonzalez-Martinez has never before been incarcerated. Given the collateral consequences to follow, more than the 36 months is not necessary.

During his incarceration, Gonzalez-Martinez will undoubtedly be taken into immigration custody while he awaits the deportation process. That will undoubtedly extend his time in custody—as he will be held in ICE detention after his sentence expires. Moreover, if he has a deportation detainer, he will be ineligible for many, if not

---

[4] Federal sentencing law tracks these purposes. Section 3553 tells Courts to choose a sentence that reflects the seriousness of the offense (retribution), promotes respect for the law (retribution, general deterrence), provides just punishment for the offense (retribution), affords adequate deterrence to criminal conduct (general deterrence), protects the public from further crimes of the defendant (specific deterrence, incapacitation), and provides the defendant with needed training, care, and treatment (rehabilitation). 18 U.S.C. § 3553(a)(2).

all, of the rehabilitative programs offered to other inmates. *See* Exhibit 2 (Federal Prisons Don't Even Try to Rehabilitate the Undocumented). Exclusion from these programs fails to help Gonzalez-Martinez be productive while incarcerated and also eliminates his chances of earning good-time for participating in these programs. And then, unlike almost every other prisoner who is sent to a half-way house approximately six months prior to release, he will also be ineligible for this service. *See* Exhibit 3, pg 30. (Bureau of Prison Report, 2012). Thus, he will serve all of his time in prison and will be unable to earn as much good-time as a citizen prisoner.

Gonzalez-Martinez also has real medical issues that appear to have exacerbated since his incarceration. It is a long-standing issue that has worsened. And though it appeared it was under control with newer, stronger medication, it has yet to abate. To be fair, it is not clear if this condition is worse because of the prison environment or just because of its regular medical course. Regardless, it makes his incarcerated time more difficult.

Gonzalez-Martinez now faces the prospect of starting over in what is, for all intents and purposes, a new country; though he grew up there, he considers the United States his home. His memories of his youth are dim and he does not really know what to expect. But he does now understands how even (seemingly) small transgressions can result in severe sanctions: incarceration, separation from his family, expulsion from his country. These have served as a harsh lesson, one he will not soon forget.

*CONCLUSION*

Mr. Hernandez thus asks this court to sentence him to 36 months incarceration.

                                      Respectfully submitted,
                                      DOMINGO GONZALEZ-MARTINEZ
                                      By his attorney,

Dated: May 24, 2018

                                      /s/ Eric Tennen
                                      Eric Tennen, BBO # 650542
                                      Swomley & Tennen, LLP
                                      50 Congress Street, #600
                                      Boston, MA  02109
                                      Tel. 617-227-9443
                                      etennen@swomleyandtennen.com

**Certificate of Service**

     I hereby certify that this document filed through the ECF system will be sent electronically to the registered participants as identified on the Notice of Electronic Filing, including counsel for the Government.

                                        /s/ Eric Tennen
                                        Eric Tennen